FILED
2013 Apr-25  PM 03:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **LISA B. REAVES**, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **1: 12-cv-0043-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of the Social**, | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On January 30, 2009, the claimant, Lisa B. Reaves, applied for disability insurance benefits under Title II of the Social Security Act and supplemental security income benefits under Title XVI of the Social Security Act. (R. 25, 53-57, 116-22). The claimant alleges disability commencing on January 28, 2009 because of symptoms and limitations related to migraines, memory loss, strokes, anxiety, depression, status post cervical fusion, Reynaud's phenomena, status post knee surgery, status post spinal surgery, adjustment disorder, and pain disorder. (R. 16, 55). These applications were denied by the Commissioner on April 17, 2009. (R. 57). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on March 2, 2011. (R. 31, 71). In a decision dated July 20, 2011, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for supplemental security income. (R. 25).

On November 3, 2011, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-3). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). For the reasons stated below, the court REVERSES and REMANDS the decision of the Commissioner.

## II. ISSUE PRESENTED

The claimant presents the issue of whether the ALJ committed a reversible error when he failed to mention or afford any weight to Dr. Torabi, the claimant's long-term treating physician who had opinions and medical evidence regarding the claimant's alleged seizures contrary to the ALJ's findings.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To make this determination the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

In determining whether the claimant's symptoms and impairments are severe enough to require disability, the claimant bears the burden of providing medical and other evidence to prove her alleged disability. 20 C.F.R.§§ 416.912(a), (c); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (citing 42 U.S.C. § 423(d)(5)(A)).

Regarding medical evidence, the ALJ must give the opinions of the claimant's treating

physicians substantial weight unless "good cause" exists for *not* doing so. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). "Good cause" is found when "the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding" and also "where the doctor's opinions were conclusory or inconsistent with their own medical records."*Id.*; *see also Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (2004); *Edwards v. Sullivan*, 937 F.2d 580, 583 (1991). Where the available medical evidence is not contrary to the treating physician's opinion, and no other good cause is presented, the Commissioner cannot discount the treating doctor's opinion. *Schnorr v. Bowen*, 816 F.2d 578 (11th Cir. 1986).

The ALJ must state, with particularity, the weight given to different medical opinions and the reasons therefor, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also Phillips*, 357 F.3d at 1241; *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The ALJ must also make clear the weight given to each item of evidence and the reasons for the amount of weight accorded. *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

In evaluating pain and other subjective complaints, the ALJ must consider whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1125-26 (11th Cir. 2002); 20 C.F.R § 404.1529.

4

# V. FACTS

The claimant has a high school education[1] and was forty-five years old at the time of the administrative hearing. (R.35).  Her past work experience includes employment as an assistant, insurance underwriter, radiology technician, clerk, typist, and optician. (R.178). The claimant alleged that she was unable to work because of symptoms and limitations related to migraines, memory loss, strokes, anxiety, depression, adjustment disorder, and pain disorder. (R. 16, 55). Although the alleged onset date for disabilities is January 28, 2009, the ALJ reviewed the extensive medical evidence dating back to 2007 for a more complete medical overview.

## *Physical Limitations*

On February 6, 2007, the claimant was admitted to the University of Alabama at Birmingham ("UAB") hospital complaining of migraine headaches. The claimant told Dr. John Rothrock, M.D., that she had been experiencing daily headaches for three-and-a-half months. The headaches were frontal, left-sided, and radiating to the parietal and occipital regions, and described as constant, pounding, and 10/10 in severity.  The claimant explained that the migraines were aggravated by routine activity, caused nausea and vomiting, and could be alleviated by being in a dark room. The claimant told Dr. Rothrock that the headaches caused a decrease in her inability to do daily activities and also a decrease in her appetite. Dr. Rothrock's notes indicate that the claimant had lost sixty pounds in the past one-and-a-half years. First, Dr. Rothrock gave the claimant Dihydroergotamine (DHE) and Compazine, which successfully alleviated some of the migraine's severity. The next day Dr. Rothrock proceeded with a more aggressive routine, adding intravenous magnesium sulfate and

---

[1]The claimant testified that she completed twelfth grade, but the record is not clear if she actually graduated high school.

Decadron, resulting in a dramatic decrease in headache severity. On February 10, 2007, the claimant was discharged from UAB because her headache was "virtually gone." Dr. Rothrock prescribed the claimant Fiorinal, Demerol, and Phenergan for acute headache treatment, and Cephpax for migraines treatment. (R. 214-15).

On August 1, 2007, the claimant returned to UAB for a routine follow-up. Dr. Rothrock indicated that the claimant was "not doing well" and was "plagued by chronic nausea" from either her migraines, methadone, or both. Although Dr. Rothrock refers to an appointment in June, the record contains no evidence of that appointment. Also, the record is unclear as to when or if Dr. Rothrock prescribed the claimant methadone. Dr. Rothrock also noted that he has unsuccessfully treated the claimant with Botox in the past. Dr. Rothrock recommended that the claimant increase her methadone dose to 10 mg, and prescribed Lortab and prednisone. Finally, Dr. Rothrock treated the claimant in clinic with Demerol and Phenergan. (R. 223).

On September 18, 2007, the claimant went back to UAB for evaluation and treatment of acute, persistent migraine headaches. The claimant claimed that she had experienced weeks of headaches that never entirely went away. At that time, the claimant was no longer on methadone or prophylatic therapy because of associated nausea. The claimant also told Dr. Rothrock that Lortab was not effective. Dr. Rothrock treated the claimant in clinic with Nubain and Phenergan, then prescribed lithium for headache prophylaxis and Percodan in place of Lortab. Dr. Rothrock noted that the claimant should be monitored for her opioid use, and also remarked that "[a]s always, despite her complaint of severe pain, she appears relatively composed." (R. 222).

On October 10, 2007, the claimant had a routine follow-up appointment at UAB. Dr. Rothrock noted that the claimant's migraines had proven to be refractory to many oral prophylactics

therapies, Botox, and methadone. Dr. Rothrock's notes indicate that he also saw the claimant on September 27, when he instructed her to stop taking lithium and instead take Keppra 500 mg, but the record does not include this September appointment. The claimant claimed that her headaches still occurred daily. Dr. Rothrock again remarked that the claimant did not appear to be under distress. Dr. Rothrock recommended that the claimant stop taking Keppra and begin a trial of phenobarbital. He also prescribed the claimant Percodan for severe headaches, and recommended that the claimant be admitted at Dr. Saper's inpatient headache treatment facility in Ann Arbor, Michigan, if her insurance covered the hospitalization. His back-up treatment plan was admitting the claimant to UAB for several days of intravenous phenobarbital treatment. Dr. Rothrock treated the claimant in clinic with IM meperidine and promethazine. (R. 221).

On October 19, 2007, the claimant visited Dr. Chandra K. Gehi, MD, of the Anniston Neurology and Headache Management Center on referral from her primary care physician, Dr. Thomas R. Perkins, Jr., MD of the Moody Medical Clinic, although the record contains no notes from Dr. Perkins. The claimant stated that she had tried many medications to try to alleviate her headache pains. The claimant mentioned that she suffered from chronic headaches since she was sixteen years old, and that the headaches stopped for five years while she was taking Topamax. The claimant complained that she was in constant pain for a year, and that she suffered from insomnia, sleeping no more than three hours each night due to her headaches. Dr. Gehi stated that the claimant was not in "acute distress but very uncomfortable, crying and frustrated with headache." Dr. Gehi's impression of the claimant was that she had chronic migraines, and he prescribed her Remeron, Anaprox, Flexeril, and clonidine. Dr. Gehi also performed a nerve treatment injection at the base of the claimant's head with Xylocaine bilaterally, and requested that the claimant return in two weeks.

7

(R. 230-31).

On November 6, 2007, the claimant returned to Dr. Gehi for a follow-up visit. Dr. Gehi remarked that the occipital block slightly improved the claimant's headaches, but the headaches and insomnia continued to exist. Dr. Gehi performed another occipital block, and advised the claimant to continue Anaprox, Flexeril, and clonidine. He also prescribed Maxzide to control the claimant's blood pressure; Remeron, an antidepressant; and Topamax as a preventive measure. Dr. Gehi requested that the claimant return in three weeks. (R. 229).

On November 15, 2007, the claimant returned to Dr. Gehi complaining of recurrent migraines, muscle contraction headaches, and severe posterior cervical neck pain. Although the occipital block had helped the claimant's conditions, the claimant explained that a migraine began on Friday and by Sunday had become so severe that she went to the emergency room. The claimant said that an injection performed at the hospital made her feel confused and dazed and did not relieve her headache. Dr. Gehi noted that the claimant had severe tenderness in her occipital area and her neck area was very sore. Dr. Gehi performed trigger point injections and an occipital block, and advised her to continue her current medications but take DHE and Phenergan, a sleep aid, as needed. Dr. Gehi requested that the claimant return in two weeks. (R. 228).

On December 10, 2007, the claimant return to Dr. Gehi complaining of recurrent migraines, muscle contraction headaches, fibromyalgia, chronic depression, and hypertension. The claimant revealed a lot of personal information to Dr. Gehi relating to her high level of stress. The claimant stated that she had been married twice, she was abused by her first husband for twenty years, and her children were giving her problems. One of her children "left" and the other was eighteen, married, and pregnant. Besides her family life, the claimant also complained of her continued headaches and

8

medications, even stating that Cymbalta was making her nervous and suicidal. Dr. Gehi indicated that the claimant appeared frustrated and depressed, and had severe neck pain that seemed like fibromyalgia pain. Dr. Gehi recommended that the claimant stop taking clonidine and Maxzide, and reduce the amount of DHE. Dr. Gehi advised the claimant to continue Topamax and Flexeril, and take Phenergan only for severe headaches. Dr. Gehi noted that the claimant should be on antidepressants but she was reluctant. Dr. Gehi requested that the claimant return in six weeks. (R. 227).

On January 22, 2008, the claimant returned to Dr. Gehi for a follow-up visit complaining of the same problems as her previous visit. She claimed that she still has headaches daily, despite her medications. Her family problems continued to give her stress, especially her daughter leaving and a conflict between her ex-husband and her children. Dr. Gehi noted that the claimant "[was] depressed, not able to work with the chronic headaches." He also stated that the claimant had severe tenderness at the base of her skull and all over her trapezius muscle. Dr. Gehi noted that he spoke with the claimaint for at least thirty minutes and came to the conclusion that her headaches were not migraines. Instead, Dr. Gehi determined that her headaches were more muscle contractions and fibromyalgia. He advised the claimant to continue taking Topamax and he increased the amount of Remeron and Neurontin. Dr. Gehi mentioned that he was reluctant to give the claimant pain medication, but did not state why exactly he came to that conclusion. He indicated that the claimant should see a psychiatrist, psychologist, or counselor. Dr. Gehi requested that the claimant return in six weeks; however his notes indicate that she did not show for her follow-up visit on March 4, 2008. (R. 226).

On November 3, 2008, the claimant saw Dr. Edwin Keel from Dr. Keel & Associates Health

Care in Oxford, Alabama  for the first time with the chief complaint of a migraine. Dr. Keel treated the claimant with an injection of a narcotic. (R. 337-39).

On November 13, 2008, the claimant had an initial visit with Dr. Amir Torabi, MD, from Northeast Alabama Neurological, and complained primarily of headaches. The claimant described her headaches as mostly unilateral, almost always right-sided, and associated with photophobia, phonophobia, and nausea. She explained that she experienced a headache at least once every two weeks, and it can last up to five days. Dr. Torabi stated that the claimant "basically has tried almost all of the medications that we know for migraines." He also noted that the claimant's blood pressure fluctuated and could be associated with her headaches. Dr. Torabi further indicated that the claimant has difficulty sleeping, although no formal sleep study had been performed. Dr. Torabi's impression stated that the claimant's migraines were atypical and refractory to medications. Some atypical features mentioned were dysautonomia, a breakdown disorder of the autonomic nervous system; redness of her right eye; and a runny nose during her headaches. Dr. Torabi deduced that these features could suggest a particular rare category of headaches instead of just migraine headaches. To see if the claimant responded to medicines specifically for these rare headache types, Dr. Torabi started the claimant on Indomethacin, Verapamil, Requip and Ropinirole (for periodic leg movement disorder), and gave the claimant samples of Treximet. (R. 306-307).

On November 25, 2008, the claimant returned to see Dr. Torabi for follow-up work regarding her migraine headaches. Dr. Torabi noted that the claimant had an allergic reaction to Indomethacin that required an emergency room visit. The claimant complained of a severe headache, lack of concentration, and memory problems.

That same day, Dr. Torabi admitted the claimant to Stringfellow Memorial Hospital for

10

observation, and prescribed her Depacon, Decedron, DHE, and Zofran. (R. 303). Dr. Torabi noted

that three days before admission, the claimant told Dr. Torabi that "she started to have headaches

associated with photophobia, phonophobia, nausea and vomiting and indomethecin which was given

by [Dr. Torabi] did not work for her." While at the hospital, the claimant underwent a spinal tap, a

CT scan, an MRI, and an MR angiogram of her brain. All of the tests came back normal, and no sign

of any acute intracranial process existed. Dr. Torabi gave the claimant Phenergan, dexamethasone,

Toradol, Imitrex, and Demorol, and the claimant's headache improved slightly while in the hospital.

Dr. Torabi recommended that the patient continue her medicines as outpatient, including Klonopin,

Ambien, Verapamil (for hypertension and migraine prevention), Topamax, Ultram, and Imitrex for

headaches. Dr. Torabi noted that he abstained from giving the claimant narcotic medication because

of the possibility of rebound headaches. (R. 288-89).

On December 5, 2008, the claimant entered the emergency department of Stringfellow

Memorial Hospital complaining of a headache. The claimant stated that the onset of her symptoms

was *thirty-three days prior*. The claimant admitted visual changes but denied fever or focal motor

weakness associated with the headache. Dr. David L. Smith, MD, treated the claimant in the

emergency room with Compazine, but the claimant stated that her pain was unchanged. Dr. Smith

indicated that the claimant had an acute severe migraine headache, and once her condition was

stable, Dr. Smith discharged the claimant. While at Stringfellow, Dr. Kevin Sells, MD, also gave

the claimant Demoral. (R. 277-79).

On December 18, 2008, the claimant saw Dr. Torabi for a follow-up visit regarding her

headaches. Dr. Torabi noted that the claimant's conditions were improved, but that she was

concerned with how much her medications were costing. Dr. Torabi indicated that the claimant

recently had a severe migraine that caused the claimant's right eye to be blind for a few hours, but an ophthalomoscopic examination did not reveal any papilldema or optic nerve paleness. Dr. Torabi recommended that the claimant continue Topamax, and also take Lortab as needed to prevent emergency room visits. (R. 302).

On December 26, 2008, the claimant entered the emergency department of Stringfellow Memorial Hospital complaining of a headache that began twenty-four hours prior. She described that the headache was frontal and throbbing with pressure. Dr. Smith again noted that the claimant was medicated with Compazine but her pain was unchanged. His clinical impression was acute severe migraine headache, and the claimant was discharged to home and given a return to work note. The record does not mention the claimant's exact employment at that time. (R. 271).

On January 21, 2009, the claimant returned to Dr. Torabi for a follow-up appointment. Dr. Torabi noted that she was "doing better than before" and was working again, but again the record does not mention which place of employment. The claimant asked for Lortab because it was helping her headaches. Dr. Torabi gave the claimant a sample of Axert and prescribed Lortab, Nortriptyline, and Thorazine, and also noted that she should not drive or work with the medication because it could cause drowsiness. (R. 631).

On January 29, 2009, the claimant saw Dr. Torabi complaining of problems with her speech, specifically that her voice had recently changed. The claimant indicated that she had recently lost her job because of concentration problems and headaches, and had missed multiple days at her new job, but, again, the record is not clear about her new place of employment. Dr. Torabi described the claimant as stressed out and anxious, but did not see any dysarthria. Dr. Torabi noted that the claimant's symptoms could be possible side effects from her medication, such as Thorazine, so he

discontinued the claimant's Thorazine usage. He also gave her a few Klonapin for anxiety attacks, and requested that she return in two months. (R. 300).

On January 31, 2009, the claimant went to Jacksonville Medical Center's emergency room complaining of a migraine headache with associated vomiting, blurred eyesight, and photophobia. The record does not clearly indicate the doctor's name who treated the claimant, but the claimant was treated with Demonerol and Phenergan. The record is also unclear about how long the claimant remained in the emergency room. (R. 313-17).

On February 5, 2009, the claimant entered Regional Medical Center's emergency room complaining of a moderate migraine. The claimant also mentioned that her daughter had just had her first baby, and the claimant had difficulty sleeping. The hospital notes indicate that after treatment with Decadron, the claimant was still unimproved. The record does not clearly indicate how long the claimant remaining in the emergency room. (R. 321-22).

On February 13, 2009, the claimant completed a Headache Questionnaire for the Disability Determination Service. The claimant stated that she experiences a headache at least two to three times per week. The claimant explained that during these headaches, she remains completely motionless in a room with no light or noise and cannot do anything for herself. The claimant also mentioned that the headaches cause her to vomit severely and have difficulties eating and drinking. The claimant stated that these severe headaches began in 2008, and typically last three to four days each. The claimant further stated that stress sometimes causes her headaches. (R. 153-54).

At the time of the Headache Questionnaire, the claimant listed Topamax, Compazine, and Lortab as her prescription medications. The claimant indicated that these medications sometimes give her relief for about an hour before the pain increases again, and that the medications cause

drowsiness and nausea. The claimant stated that she has "had over 300 shots in the face and head [and] it didn't work." The claimant also mentioned that her headaches require emergency room treatment, sometimes as often as every week or two. Finally, the claimant commented that "my headaches have control over my life[.] I don't have a clue when one is coming until it is too late[.] I lose my vision in the right eye for a short time[.] I see stars and start throwing up." (R. 154-55) (punctuation added).

On February 13, 2009, Laurie A. Tipton, a friend of the claimant for over twenty-five years, completed a Daily Activities Questionnaire (Third Party Information) for the Disability Determination Service. Ms. Tipton indicated that the claimant suffers from headaches most days and, therefore, usually spends her day in bed to reduce the pain, but has trouble sleeping. Ms. Tipton mentioned that the claimant rarely goes shopping, does not cook, cannot stand for prolonged periods of time, and needs assistance with any movement during a headache episode. Ms. Tipton stated that the claimant "rarely goes out anywhere anymore, especially since the Dr. told her she cannot drive because she never knows when she may have another stroke," and that the claimant was a very social person before her migraine problem. (R. 146-49).

On February 19, 2009, the claimant completed a Function Report for the Social Security Administration. Regarding daily activities, the claimant indicated that she usually eats breakfast but occasionally has to throw up afterwards. Then, the claimant gets back in bed to lay down until lunch time, when her mother-in-law prepares lunch for her. The claimant stated that after lunch she rests until her mother-in-law prepares dinner, and then the claimant goes to sleep for the night. The claimant mentioned that she had difficulty sleeping because of her pain. The claimant also indicated that prior to her alleged illness and pain, she lived an active lifestyle, including cleaning the house,

cooking, and looking after her family. The claimant stated that she required help dressing, bathing, caring for her hair, and using the bathroom when she experienced a headache, and that she is sometimes too sick to eat. (R. 158-59).

Furthermore, the claimant stated in her Function Report that she does not drive, rarely shops, and rarely goes outside. The claimant mentioned that she is unable to concentrate for long periods of time or pay attention for more than a few minutes, and she does not follow instructions well. Regarding her social life, the claimant indicated that she no longer had hobbies, only spends time with others when they come to her house, but attends church. In the section about her abilities, the claimant stated that her illness affected the following abilities: lifting; squatting; bending; standing; reaching; walking; sitting; kneeling; talking; hearing; stair climbing; seeing, memory; completing tasks; concentration; understanding; following instructions; using hands; and getting along with others. When asked to explain how her illness affected the items, the claimant explained that she is "not able to do anything" during a headache episode. (R. 161-63).

Finally, the claimant mentioned she loses her memory and forgets where she is sometimes. The claimant remarked that, for example, she could not remember anything from her daughter's wedding in November, 2008, and that she apparently took off her under garments before walking down the aisle, and slurred her speech throughout the night. She also stated that a similar instance occurred at her workplace where her co-workers "thought I was on drugs and I was having a stoke" and it led to her termination from that job. (R. 164-65).

On February 19, 2009, the claimant also completed a Work History Report for the Social Security Administration. The claimant indicated that her previous work included: assistant for an insurance agent; underwriter for an insurance broker; radiology technician at a hospital; clerk at a

tire warehouse; typist for an insurance broker; and an optician. The claimant stated that she did not use machines, tools, or equipment in any of these jobs, but did use technical knowledge and skills and also completed reports. Her latest employment as an optician from 2007 to January 2009 included edging lenses for glasses, fitting patients for glasses, answering the phone, handling returns of glasses and contacts, and ordering supplies. (178-85).

On March 21, 2009, the claimant returned to see Dr. Keel complaining of a migraine with nausea and light and sound sensitivity. Dr. Keel again treated the claimant with a narcotic injection before discharging her. (R. 334-36).

On March 25, 2009, the claimant saw Dr. Torabi, who noted that the claimant was anxious and depressed, and also had periods of confusion. Dr. Torabi found that the claimant had an abnormal EEG with slow activity, but no clear evidence of seizure. Dr. Torabi's notes indicate that the claimant's chronic anxiety and depression caused her chronic headaches. Dr. Torabi gave the claimant samples of Keppra, for partial onset seizures, and prescribed Nadolol and Stadol for her headaches. (R. 628).

On April 2, 2009, Dr. Robert G. Summerlin, Ph.D., a licensed psychologist, evaluated the claimant at the request of the Disability Determination Service. Dr. Summerlin began by noting that the claimant's husband also attended the session and they both gave good background information and effort. Dr. Summerlin previously reviewed the claimant's medical records. Dr. Summerlin reported that the claimant mentioned a history of migraines, hypertension, and possible strokes. The claimant also mentioned that she could not remember anything from her daughter's wedding in November of 2008, but apparently slurred her speech and took off her undergarments before walking down the aisle. She claimed that she "thought [she] was on drugs and [] was having a stroke." Dr.

16

Summerlin stated that the claimant's last job was at an eye clinic, but that she lost her job when she "blacked out and went crazy." Dr. Summerlin indicated that the claimant had never abused recreational drugs nor prescription medications.

Dr. Summerlin described the claimant as neatly dressed and groomed, appeared younger than her age, and oriented. He also indicated that the claimant's remote memory functioning was intact, and her abstract thinking ability, knowledge of general information, computational skills, and vocabulary were consistent with her education and IQ. The claimant's thought processes were labeled as logical, coherent, and focused, and her thought content was responsive to questioning. Dr. Summerlin stated that the claimant has problems with sleep and only receives approximately six hours of sleep each night, and could groom herself without assistance but could not perform household chores. Dr. Summerlin also stated that the claimant could talk on the phone, shop with her husband, visit family, watch TV, and listen to the radio, but did not operate a motor vehicle since January 2009 and also did not attend group gatherings. Finally, Dr. Summerlin offered the following diagnostic impressions: pain disorder associated with both psychological factors and a general medical condition; psychological symptoms affecting medical condition, conversion disorder (provision); dissociative amnesia (provisional); and malingering (provisional). Dr. Summerlin noted that if the claimant's medical conditions did not explain her dissociative behavior then the claimant should have a more thorough psychoneurological evaluation and therapy. He also suggested the claimant experience a trial on antidepressant medicines, but the record does not clearly indicate if the claimant followed Dr. Summerlin's suggestion. (R. 324-26).

On April 4, 2009, the claimant saw Dr. Keel at Patient First Healthcare again, complaining of a migraine with no associated symptoms. Dr. Keel ordered two new prescriptions for the claimant,

but the only evidence of the prescriptions is in Dr. Keel's handwriting that is illegible. (R 330-31).

On April 6, 2009, Dr. Eugene E. Fleece, Ph. D, completed a Mental Residual Functional Capacity assessment for the claimant.  In the category of Understanding and Memory, Dr. Fleece checked that the claimant was not significantly limited or moderately limited. Under Sustained Concentration and Persistence, Dr. Fleece marked the claimant significantly or moderately limited in all areas. In the Social Interaction category, the claimant was either not significantly limited or moderately limited in every section except she was markedly limited in the area of interacting appropriately with the general public. Dr. Fleece also considered the claimant not significantly limited or moderately limited regarding her adaptation. Dr. Fleece assessed that the claimant could understand and recall simple workplace duties and procedures; execute simple commands; concentrate for two hour periods; could make an eight hour work day if given routine breaks; and would need some supervisory flexibility in scheduling but would remain competitive in the workplace. Dr. Fleece opined that the claimant would miss a day of duties each month due to her mental disorders. He strongly believed that the claimant should not have any contact with the general public, but that the claimant could take and use direct, non-confrontational supervision, and the claimant would not distract co-workers to a significant loss of production.

Under Anxiety-related Disorders, Dr. Fleece noted that the claimant's anxiety disorder is present but does not precisely satisfy the diagnostic criteria. Under Somatoform Disorders, Dr. Fleece stated that the claimant's unexplained spells and pain indicated an impairment that does not precisely meet the diagnostic criteria. Dr. Fleece also noted that the claimant's personality disorder might make her "possibly dependent." Under Functional Limitations, Dr. Fleece categorized the claimant as requiring a moderate degree of limitation. Dr. Fleece's consultant notes indicate that he

18

mostly considered the opinions and evaluations of Dr. Gehi, Dr. Torabi, and Dr. Summerlin, in combination with the claimant's limited daily activities. (R. 341-57).

On April 11, 2009, Ashley Terry, a Disability Specialist and Single Decisionmaker, completed the claimant's Physical Residual Functional Capacity assessment. Ms. Terry noted that the claimant was capable of occasionally lifting twenty pounds; frequently lifting ten pounds; standing, walking, or sitting six out of eight hours per day; pushing and pulling with no limitations; frequently climbing ramps and stairs; frequently balancing, stooping, kneeling, crouching, and crawling; and never climbing ladders, ropes, or scaffolds. Ms. Terry based her recommendations on the claimant's medical records from Northeast Alabama Neurological, Stringfellow Memorial Hospital, Jacksonville Medical Center, and Regional Medical Center. Ms. Terry also gave the claimant unlimited environmental limitations, except to avoid concentrated exposure of vibration, fumes, odors, dusts, gases, poor ventilation, hazards, and unprotected heights. When asked how consistent the severity of the claimant's alleged symptoms was based on all the evidence seen, Ms. Terry remarked that the "claimant alleges chronic migraines and strokes. Claimant states that I end up in the ER everytime I have a migraine, I can't sit up, I can't walk, I can't see, and I can't stand the light in my eyes. Claimant's reported symptoms severity is considered partially credible based on the medical evidence in file." (R. 360-66).

On April 20, 2009, the claimant went to C.A.R.E.S. Immediate Family Care complaining of a migraine. She refused to have a CT of her head done because of the expense, and was discharged. (R. 369).

On May 27, 2009, the claimant returned to Dr. Torabi's office for a follow-up appointment about her headache pain. Dr. Torabi indicated that the claimant was doing "the same" and had

headaches from time to time. He also mentioned that the claimant did not have insurance and, therefore, could not afford many medications. Dr. Torabi prescribed the claimant Tegretol, Cafergot, Compazine, and Lortab for her pain. (R. 627).

From July 26, 2009 to October 31, 2010, the claimant went to the emergency room of Jacksonville Medical Center fourteen times complaining primarily of headaches, occasionally with associated vomiting or vision problems. The doctors at the Medical Center typically treated the claimant with Compazine, Toradol, Phenergan, and Demorol, and sometimes gave the medications through injections. One note regarding medications also indicated that morphine was given to the claimant on February 18, 2010, but because the note was handwritten and unreadable, it is not clear who ordered or gave the claimant the morphine. (*See* R. 542). Additionally, a CT scan done on April 20, 2010 indicated no mass effects; no midline, shift or intracranial hemorrhage; and no significant abnormality. (R. 526). The severity of pain varied between these emergency room visits, ranging from mild/moderate to severe. (*See* R. 459, 529, 541, 549). The record indicated that on September 16, 2010, the claimant could ambulate and perform all activities of daily living independently, and demonstrated the ability and willingness to learn. (R. 459). Upon referral, the claimant saw Dr. James Yates for follow-up appointments. (R. 432-595).

On July 28, 2009, the claimant went to Dr. Torabi for an appointment regarding her headaches. Dr. Torabi mentioned that the claimant went to the emergency room recently, and had a possible seizure in June where she "was driving and lost control." Dr. Torabi prescribed the claimant Depakote for her seizures, Clonidine for hypertension, and Lortab and Relpax for her headaches. (R. 626).

On October 16, 2009, the claimant saw Dr. Torabi for a follow-up appointment. Dr. Torabi

noted that the claimant was doing very well, had only one or two recent headaches, and had not experienced any seizure activity for a long period of time, although he did note that an abnormal EEG suggested a complex partial seizure. Dr. Torabi continued the claimant's medications of Stadol and Depakote. (R. 625).

On January 19, 2010 the claimant established herself as a patient of Dr. Yates after Dr. Torabi left town. From January 19, 2010 to February 5, 2011, the claimant visited Dr. James Yates four times. Between those visits, Dr. Yates also frequently wrote the claimant prescriptions, faxed records to Dr. Upadhyay, and gave the claimant samples of new medications for her headaches. (R. 597-601).  On the first visit, Dr. Yates noted that the claimant's medical history included migraines and complex partial seizure disorder with associated amnesia, although she had not experienced a seizure "in quite a while." Dr. Yates also indicated that the claimant experienced migraines about two or three times a month, but the migraines disappear  rapidly with her medications and she could function well regardless. Dr. Yates noted that the migraines increased recently because the claimant was out of some medications, although the record does not state why the medications were unfilled. Dr. Yates prescribed the claimant propranolol and Compazine and gave samples of Depakote. (R. 601).

On February 17, 2010, the claimant returned to Dr. Yates because of an increase in migraine frequency. Dr. Yates changed the prescription of propranolol to Nadolol and gave the claimant samples of Relpax. (R. 600).

On May 27, 2010, the claimant returned to Dr. Yates complaining of trouble with her migraines. Dr. Yates had previously prescribed the claimant Norco for pain, and it was working "reasonably well," but the Topamax cause the claimant to feel foggy, unlike in the past. Dr. Yates

21

recommended that the claimant taper off her use of Topamax, prescribed Nadolol, Norco, and Depakote, and gave samples of Treximet and Sumavel. (R. 599).

On September 2, 2010, the claimant returned to Dr. Yates still complaining of migraines. Dr. Yates noted that the claimant had tried all of the prophylactic regimens available for her migraines. Dr. Yates refilled her prescriptions of Nadolol, Norco, and Sumavel. (R. 598).

On November 16, 2010, Dr. Yates referred the claimant to Dr. Upadhyay's pain clinic. Dr. Yates also noted that the patient claimed Lortab was not helping her migraines but Demerol and Toradol helped. (R. 597).

On December 8, 2010, the claimant visited the office of Dr. Shailesh Upadhyay, MD, for a consultation regarding her chronic migraines. The claimant described her pain as throbbing and constant in the temporal region, and she also indicated that her pain was a moderate five out of ten and was causing her to have sleep problems. Dr. Upadhyay noted that the claimant's pain was aggravated by activity and exertion, and improved by rest. Besides evaluating the claimant's headaches, Dr. Upadhyay also stated that the claimant was positive for anxiety and an eating disorder. Dr. Upadhyay performed a full drug screening on the claimant, prescribed oxycodone and Topamax, and requested that the claimant return in one month. Dr. Upadhyay also referred the claimant to a neurologist. (R. 394-97).

On January 5, 2011, the claimant saw Dr. Upadhyay complaining of chronic migraines. Dr. Upadhyay noted that the claimant had not taken a pain pill in several days, but the record does not indicate her reason for doing so, and he discussed taking pain medications correctly with the claimant. Dr. Upadhyay stated that the claimant's pain scale appeared to be a two out of ten, and that her mobility and general functioning were normal. Dr. Upadhyay continued the claimant's current

medications. (R. 391-93).

On February 7, 2011, the claimant returned to Dr. Upadhyay complaining of chronic migraines and neck pain. Dr. Upadhyay noted that oxycodone and Topamax were helping to control some of the claimant's pain, and that her pain appeared to be a two on a scale of one to ten. Dr. Upadhyay also indicated that the claimant explained potential addiction problems with narcotic treatment. Dr. Upadhyay continued the claimant's prescriptions of oxycodone and Topamax, but he limited the number of refills, and he prescribed Flexeril to control muscle spasms. (R. 388-90).

On May 11, 2011, Dr. Summerlin performed a second evaluation of the claimant for the Disabilities Determination Service. Dr. Summerlin reported that the claimant continued to claim primary problems of migraines and hypertension. He also noted that the claimant experienced great memory loss since her initial evaluation, but no studies confirmed the alleged strokes. Dr. Summerlin reported that the claimant appeared neatly dressed and groomed, and weighed about sixty pounds less than when he saw her two years prior. He noted no abnormalities in her speech, and her remote memory functioning appeared to be intact. Dr. Summerlin found that the claimant's abstract thinking, fund of general information, and vocabulary were consistent with her educational background and IQ, and her thought processes were logical, coherent, focused, and without interference from a psychotic process. Dr. Summerlin indicated that the claimant had a very poor appetite. He also found that the claimant bathed and groomed herself without help, drove as necessary, shopped and visited with family members, watched tv, listened to radio, and attended church. Dr. Summerlin opined that the claimant suffered from pain disorder associated with both psychological factors and a general medical condition (migraine headaches); psychological factors affecting medical condition (migraine headaches); adjustment disorder with mixed anxiety and

depressed mood, chronic; general medical conditions of migraine headaches and hypertension; and mild to moderate emotional symptoms affecting person, social, and occupational functioning. Dr. Summerlin concluded that while the claimant did not have a psychological disorder that would cause her to be unemployable, she had a constricted lifestyle with a strong dependency on family members. Finally, Dr. Summerlin suggested that the claimant see a counselor to help develop a more productive lifestyle. (R. 607-9).

On May 11, 2011, Dr. Summerlin also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) for the claimant's disability request. Dr. Summerlin indicated that the claimant's impairments affected her ability to understand, remember, and carry out instructions. Specifically, he marked that the claimant's migraine headaches, anxiety, and depression mildly affected her understanding, remembering, and carrying out simple instructions, but moderately affected her understanding, remembering, carrying out, and making judgments on complex work-related instructions and decisions. Dr. Summerlin also found that the claimant's impairments affected her ability to interact appropriately with supervisors, co-workers, and the general public, and respond to changes in a routine work setting. He marked that the claimant's migraine headaches, anxiety, and depression mildly affected her interaction with the public, supervisors, and co-workers, and moderately affected her ability to respond appropriately to usual work situations or changes in work settings. Dr Summerlin finally noted that the claimant's impairments limited her ability to perform household chores. (R. 610-12).

On May 19, 2011, the claimant visited Dr. Hisham Hakim, MD, a neurologist, at the request of the ALJ. Dr. Hakim noted that Topamax was helping the claimant's headaches, and that the claimant had not been to the emergency room because her pain medication was working reasonably

fast. Dr. Hakim indicated that the claimant experienced about five headaches per month, and the headaches lasted about one hour with her medications. Dr. Hakim mentioned that the claimant also experienced pain at the base of her neck, possible Raynaud's phenomena, and depression. Dr. Hakim noted that the claimant worked until about two years prior and stopped because of "an episode" where she lost her memory, but such a problem had not been repeated. Dr. Hakims opined that the claimant suffered migraine headaches, status post cervical fusion pain, Raynaud's phenomena and possibly carpal tunnel syndrome, status post surgery knee pain, and chronic depression. (R. 620-22).

*ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 71). The hearing took place on March 2, 2011. (R. 31). The claimant testified that she last worked in January of 2009 for an eye care business, selling glasses and contacts for about two years. The claimant explained that before that job, she was an insurance underwriter for Southern Cross Underwriters for about six years, and also performed clerical work in insurance for about seven years prior. The claimant testified that she left her last job in January of 2009 because she was having seizures or some sort of altered medical state that caused her to need her husband to pick her up and take her to the doctor. The claimant testified that although the doctors ran tests on her, she did not remember what the tests revealed but she received ongoing treatment and medication. (R. 36-39).

Regarding daily activities and limitations, the claimant testified that she drove some, did very little housework, did not handle her own finances, and attended church. She also mentioned that her mother-in-law lived with her and did the housework. The claimant stated that on a typical day she did "[n]ot much of nothing." (R. 40-42). The claimant testified that she suffered severe

migraines, memory problems, tingling in her fingers and hands, and neck pain after neck surgery in 2005. The claimant also indicated that she had back surgery in the '90s. The claimant testified that she had trouble gripping and lifting things, and would definitely experience trouble lifting a ten-pound bag of flour. (R. 40-43, 46).

Regarding pain and medications, the claimant testified that the only pain medication she took was Oxycodone, and only took Oxycodone when she experienced headaches. The claimant explained that she usually had a headache one or two times per week. When asked, the claimant stated that no doctors speculated that her chronic headaches could be related to her neck problems. The claimant also indicated that Dr. Upadhyay was "helping [her] more." Furthermore, the claimant testified that it would be difficult to keep an office job like she had in the past because of her migraines and neck problems.  (R. 45-48).

The ALJ then examined the vocational expert, Dr. Linda Williams. Dr. Williams first testified that the claimant's work as a clerk typist was considered a sedentary and semi-skilled position. Next, Dr. Williams testified that the claimant's employment as a customer service representative was a light and semi-skilled position. Also, Dr. Williams stated that the claimant's work as an underwriter was a sedentary and skilled position. (R. 49).

The ALJ asked Dr. Williams three hypothetical situations. First, the ALJ asked Dr. Williams to assume that the claimant was a person the same age, education, and past work as the actual claimant; was limited to light, unskilled work with no hazardous machinery; could perform no work at unprotected heights; could not operate motor vehicles; and had only occasional contact with the general public. Dr. Williams testified that those limitations could not apply to the claimant's past work, but could apply to an inspector/hand packager. She further testified that an inspector/hand

packager requires light and unskilled work, and that 1,800 jobs of this type exist in Alabama, and 100,000 jobs of this type exist in the nation. Dr. Williams then testified that the limitations could apply to a cleaner/housekeeper because it is also light and unskilled and that 2,500 jobs of this type exist in Alabama and 150,000 jobs of this type exist in the nation. Dr. Williams also testified that a small products assembler would also fit the limitations, because it is light and unskilled work, with 1,200 such jobs existing in Alabama and 150,000 such jobs existing in the nation. (R. 49-50).

The ALJ then asked Dr. Williams to consider a second hypothetical, regarding a person with the same limitations but who also would miss four or more days per month because of complications from her medical condition. Dr. Williams testified that such a person would not be able to perform any of the jobs previously mentioned, nor any other jobs in the national economy. (R. 50).

Next, the ALJ asked Dr. Williams to consider a third hypothetical, regarding a person with again the same limitations as the first hypothetical, but also had marked impairments in concentration, persistence, and pace. Dr. Williams testified that such a person would not be able to perform any of the jobs previously mentioned, nor any other jobs in the national economy. (R. 50-51).

The ALJ asked the claimant to see a State neuropsychologist for an examination in the thirty days following the hearing. The ALJ stated that such an examination would need to occur before he could make a decision in the case. (R. 51). On May 19, 2011, Dr. Hisham Hakim, MD, a neurologist, evaluated the claimaint at the ALJ's request, and Dr. Hakim's records and opinions were part of the record considered by the ALJ in making his decision.

*ALJ's Decision*

On July 20, 2011, the ALJ issued a decision finding that the claimant was not disabled under

the Social Security Act. (R. 25). First, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of her disability. Next, the ALJ determined that the claimant had the severe impairments of migraines; status post cervical fusion; Reynaud's phenomena; status post knee surgery; status post spinal surgery; adjustment disorder; and pain disorder. (R. 16).

The ALJ concluded that these impairments did not singly nor in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. Specifically, the ALJ found that the severity of the claimant's impairments did not meet the severity contemplated in the listings. The ALJ explained that no medical expert concluded in the claimant's record that her impairments meet or equal a listing requirement. (R. 16).

The ALJ found that the claimant's mental impairments did not singly or in combination meet or equal the medical criteria of the Anxiety-related Disorders listing or Somatoform Disorders. The ALJ clarified that in order to meet those listing requirements, the claimant's mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. The ALJ explained that a "marked" limitation is more than moderate but less than extreme. (R. 16).

The ALJ found that although the claimant has moderate restrictions in daily living, social functioning, and concentration, persistence, or pace, the impairments do not qualify as "marked" according to her medical record. Furthermore, the claimant experienced no episodes of decompensation for extended duration. The ALJ concluded that because the claimant's mental impairments do not result in at least two marked limitations or repeated and extended episodes of decompensation, the claimant's mental impairments did not meet the criteria of the listings

28

requirements. The ALJ also noted that the alternative criteria for meeting the listing, referred to as "paragraph C" criteria, were not presented in the claimant's evidence. (R. 16-17).

Next, after considering the entire record, the ALJ determined that the claimant had the residual functioning capacity to perform limited light work. Specifically, the ALJ limited the claimant to light, unskilled work with no hazardous machinery, unprotected heights, operating of motor vehicles, and only occasional contact with the general public. In determining this functioning capacity, the ALJ followed the Eleventh Circuit's pain standard. First, he determined whether the claimant had a medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain and symptoms. Then, the ALJ considered whether the claimant's objective medical evidence confirms the severity of the alleged pain arising from that condition or that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain. The ALJ noted that if statements made by the claimant regarding the intensity, persistence, or limiting effects of her pain are not supported by the objective medical evidence, the ALJ had to decide the credibility of the statements based on the record as a whole. (R. 17).

To address the claimant's allegations of her limitations from her impairments, the ALJ discussed the claimant's responses from her Disability Report, Headache Questionnaire, Function Report, and testimony from the hearing. The ALJ mentioned the claimant's statements that she could not perform job duties because she suffered from migraines, memory loss, strokes, anxiety, depression, and chronic migraines. The ALJ further noted the claimant's statements that she ended up in the emergency room every time she experienced a migraine, and could not sit, walk, see, eat, or sleep. The ALJ also mentioned the claimant's allegation that her daily activities were severely

limited specifically because of her headaches. (R. 17-18).

Regarding daily activities, the ALJ stated that the claimant allegedly did very little housework, attended church on Sundays, and could lift up to ten pounds. The ALJ noted that the claimant testified that she had "seizures" that caused her to leave work in the past, and that she no longer drove herself. The ALJ considered that the claimant reported several migraines per week, had neck surgery in 2005, and takes medication one or two times per week. (R. 18). The ALJ stated that although the claimant alleged a history of cerebrovascualar accidents, her medical record does not indicate evidence to support the allegation.

The ALJ determined that, while the claimant does have underlying medical impairments that could reasonably cause pain, the pain is not to the extent alleged. The ALJ explained that statements made regarding symptoms and pain cannot, alone, establish disability. To evaluate the intensity and persistence of the claimant's symptoms, the ALJ stated that he looked to 1) daily activities; 2) the location, duration, frequency, and intensity of pain and other symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side-effects of her medications; 5) treatment, other than medications, for pain alleviation; 6) any other measures used to relieve pain; and 7) other factors concerning functional limitations and restrictions due to pain and other symptoms. The ALJ determined that the claimant's testimony regarding daily activities, medications, pain, and symptoms were not fully credible. (R. 18-19).

The ALJ pointed to the claimant's reported "strokes," noting that no medical evidence existed to support cardiovasular accidents. The ALJ also mentioned that the claimant once complained of speech problems, but that the treating doctor saw no dysarthria. Additionally, the ALJ indicated that the results of the EEG and MRI tests in 2008 showed no epileptiform activity, no

clinical seizure activity, and no acute intracranial abnormality, but an indication of mild degree of global encephalopathy from abnormal theta range diffusion. Throughout the ALJ's brief recitation of the claimant's medical record, the ALJ only mentions the name of one of the claimant's many treating physicians. Specifically, the ALJ merely stated that Dr. Upadhyay treated the claimant for pain management, and never mentioned Dr. Rothrock, Dr. Gehi, Dr. Keel, Dr. Yates, or Dr. Torabi in his decision. (R.19).

The ALJ also considered medical evidence that would seem to support the claimant's credibility. For instance, the ALJ noticed that the claimant's doctors opined that the claimant suffered from anxiety disorder, chronic tension headaches, and migraines. Additionally, the ALJ considered the large number of emergency room visits and other doctor visits for the claimant's migraines, and he noted that the claimant was usually treated with injections for her pain and migraines. (R. 19).

However, based on the claimant's medical record, including evidence predating the alleged onset date, the ALJ determined that the claimant was not disabled and was capable of performing less than light work activity. The ALJ based this determination particularly on the consultative examination by Dr. Summerlin, consultative examination by Dr. Hakim, and a non-examining review of the claimant's records by Dr. Fleece. The ALJ did not specifically mention the names of any other physician, but he noted that he did give weight to the claimant's treatment records, but did not mention the amount of weight or indicate which records. The ALJ gave little weight to the claimant's friend, Laurie A. Tipton's opinion, and did not accord the Single Decision-Maker any evidentiary weight. (R. 20-23).

The ALJ gave significant weight to Dr. Summerlin, a clinical psychologist and the State

31

Agency's examining psychologist. The ALJ noted that Dr. Summerlin's opinions were supported by his own clinical examinations and tests and were consistent with the medical record as a whole. The ALJ gave additional weight to Dr. Summlerin because he was a specialist on the claimant's medical issues regarding psychological disorders. (R. 21).

The ALJ considered Dr. Summlerin's examination of the claimant performed on May 11, 2011, following the ALJ hearing,  and also noted Dr. Summerlin's previous examination done two years prior. The ALJ noted that Dr. Summerlin believed the claimant had a pain disorder associated with psychological factors and a general medical condition of migraine headaches; psychological factors affecting migraine headaches; chronic adjustment disorder with mixed anxiety and depressed mood; general medical conditions of migraines and hypertension; and mild to moderate emotional symptoms affecting personal, social, and occupational functioning. The ALJ also noted that Dr. Summerlin specifically stated that he believed the claimant did not have a psychological disorder that would make her unemployable, but she had a strong dependancy on family members. (R. 20).

The ALJ next considered the Medical Source Statement of Ability to do Work Related Activities (Mental) completed by Dr. Summlerin. The ALJ mentioned that Dr. Summerlin opined that the claimant's ability to understand, remember, and carry out instructions was mildly affected by her impairments, and her ability to make judgments on complex work-related decisions and understand, remember, and carry out complex instructions was moderately affected by her impairments. Also, the ALJ's opinion includes that Dr. Summerlin noted that the claimant had a mild limitation in interacting appropriately with the public, supervisors, and co-workers, and a moderate limitation in responding appropriately to usual work situations and changes in routine work setting. The ALJ mentioned that Dr. Summerlin stated that the claimant's ability to perform

housework was limited. The ALJ stated that Dr. Summerlin's opinions were based on the claimant's impairments of migraines, anxiety, and depression. (R. 20).

The ALJ then looked to Dr. Hakim's neurological consultative examination from May, 2011, also following the hearing. The ALJ gave substantial weight to Dr. Hakim's opinions because, although not a treating physician, he was the State's examining physician; his opinions were well supported by his own examinations and tests; and his opinions were not inconsistent with the record as a whole. Also, the ALJ noted that Dr. Hakim's opinions were in his area of speciality, so the ALJ afforded more weight to Dr. Hakim's neurological opinions. (R. 21).

The ALJ noted that Dr. Hakim's impressions included migraines, status post cervical fusion, Raynaud's phenomena, possible carpal tunnel syndrone, knee pain, and chronic depression. The ALJ also specifically mentioned that Dr. Hakim remarked that the claimant had about five headaches per month but responded to her medication reasonably quick. The ALJ next looked to the Medical Source Statement of Ability to do Work Related Activities (Physical) completed by Dr. Hakim. The ALJ considered Dr. Hakims opinions regarding the claimant's physical limitations, stating that she could: frequently lift and carry ten and twenty pounds; occasionally lift fifty pounds; sit for two hours at a time, twice during an eight hour workday; stand and walk each for one hour at a time, twice during an eight hour workday; frequently reach, handle, finger, and feel bilaterally; frequently push and pull with her hands and feet; occasionally climb ladders or scaffolds; frequently climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; occasionally work around moving mechanical parts, operate motor vehicles, work around humidity, wetness, dust, odors, fumes, and pulmonary irritants, extremes in temperature, and vibrations; never work around unprotected heights; and could work around moderate noise. (R. 21).

33

Next, the ALJ gave some weight to Dr. Fleece, who evaluated the claimant's psychological disorders for disability purposes but did not actually examine the claimant. The ALJ stated that he afforded little weight to Dr. Fleece's opinions when they were contrary to the conclusions the ALJ derived from the entirety of the record. (R. 22).

The ALJ considered Dr. Fleece's opinions in the Psychiatric Review Technique from April, 2009. The ALJ stated that Dr. Fleece gave the claimant moderate limitations in daily living, social functioning, concentration, persistence, and pace. Dr. Fleece also opined that the claimant had experienced one or two episodes of extended duration of decompensation. The ALJ also looked to the Mental Residual Functional Capacity Assessment completed by Dr. Fleece. The ALJ noted that Dr. Fleece determined that the claimant had to ability to understand a recall simple workplace duties and procedures; execute simple commands without difficulty; concentrate for two-hour periods with routine breaks; work an eight-hour workday; ask for some supervisory flexibility; be competitive in the workplace; show some irritable and anxious signs if in close proximity to others; miss a day of routine duties each month because of her impairments; have no contact with the general public; take and use direct, non-confrontational supervision; and adapt to workplace changes so long as the changes are simple, gradual, or well-explained. The ALJ stated that Dr. Fleece found the claimant not to be disabled. (R. 22).

The ALJ subsequently found that, based on the vocational expert's testimony,  the claimant was unable to perform any past relevant work, and no transferable skills existed within the limited light residual functional capacity. The ALJ determined that the claimant's ability to perform light work activity was impeded by her impairments, and asked the vocational expert if jobs existed in the national economy for the claimant, based on her age, education, work experience, and residual

functional capacity. Because the vocational expert testified that the claimant was capable of performing the work of an inspector housekeeper, cleaner, or small parts assembler, the ALJ concluded that the claimant was capable of making a successful transition to these jobs that exist in significant numbers in the national economy. The ALJ ultimately determined that the claimant was not disabled under the rules of the Social Security Act. (R. 23-24).

## VI. DISCUSSION

**1.      The ALJ committed reversible error when he failed to mention or afford any weight to Dr. Torabi, the claimant's long-term treating physician who had contrary opinions and medical evidence regarding the claimant's alleged seizures.[2]**

The ALJ must make clear the weight accorded to each item of evidence and the reasons for the decision so that the reviewing court may determine whether the decision is based on substantial evidence. The failure to specifically articulate that weight is a reversible error. *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981); *see also Sharfarz v. Bowen*, 825 F.2d 278, 279.

The law in this circuit is well established that the Commissioner must accord the opinions of the treating physician with substantial or considerable weight. *Lamb v. Bowen,* 847 F.2d 698, 703 (11th Cir. 1988).  Absent a showing of *good cause* to the contrary, the commissioner cannot discount the treating physician's opinions. *Id.*   "Good cause" is a fairly broad standard and the Eleventh Circuit has recognized its existence in at least three sets of circumstances.   The first circumstance exists where the opinion of the treating physician is accompanied by no objective medical evidence, is wholly conclusory, or is contradicted by the physician's own treatment notes. *Edwards v.*

---

[2]The court notes that the claimant mistakenly refers to these seizures as strokes in her testimony. However, the medical evidence as a whole suggests that these incidents were actually seizures, and the claimant, as a layperson, was most likely just confused about the medical terminology.

*Sullivan*, 937 F.2d 580, 583 (1991); *see also Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (2004). The second circumstance exists where the "treating physician's opinion was not bolstered by the evidence." *Phillips*, 357 F.3d at 1241. Finally, the ALJ can find good cause to discount the treating source opinion where the "evidence supported a contrary finding" from that of the treating source. *Id*.; *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987) ("ALJ may reject any medical opinion if the evidence supports a contrary finding"); *Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984).

However, where medical evidence does not conclusively counter the treating physician's opinion, and no other good cause is presented, the Commissioner cannot discount the treating doctor's opinion. *Schnorr v. Bowen*, 816 F.2d 578 (11th Cir. 1986). If the ALJ decides to discount the opinion of the treating physician, he must "clearly articulate" his reasons for doing so. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).

In this case, the ALJ did not articulate the weight given, if any, to the claimant's treating physician, Dr. Torabi. Although the ALJ stated that he "considered all medical evidence of record and the opinions of the treating and examining physicians," the ALJ never *specifically* considered or articulated the weight given to the claimant's major treating physician. Dr. Torabi treated the claimant from November, 2008 through October, 2009, mostly for her headaches. The statements and medical opinions made by this treating physician should have been specifically mentioned and afforded weight, especially because of the duration of the treatment, and to neither mention nor discredit Dr. Torabi was a reversible error.

Dr. Torabi's opinions provide important evidence that contradicts the ALJ's statements regarding the claimant's possible strokes or seizures. The ALJ particularly stated that no evidence

existed to support the claimant's alleged strokes or seizures, but on July 28, 2009, Dr. Torabi noted

that the claimant had "one episode of possible seizure back in June." Dr. Torabi subsequently

prescribed the claimant seizure medication to take regularly, twice a day. (R. 626). Furthermore, on

October 16, 2009, Dr. Torabi noted that the claimant had an abnormal EEG that suggested "complex

partial seizure," and he refilled the claimant's seizure medication. (R. 625).

The relevant legal standard requires the ALJ to clearly state the weight given to medical

opinions and the reasons for doing so; however, the ALJ never even mentions Dr. Torabi's name in

the opinion or discusses this contrary finding regarding the claimant's seizures.

Dr. Torabi's progress notes and impressions also contain important information about the

claimant's daily limitations, medications, and frequent headache pain, each of which the ALJ

claimed to be a factor he considered, but the ALJ never mentioned Dr. Torabi's relevant opinions.

For instance, on January 29, 2009, Dr. Torabi noted that the claimant had just lost her job because

of concentration problems and headaches, and had already missed multiple days at her new job. (R.

300). Additionally, upon his initial visit with the claimant, Dr. Torabi remarked in his notes that the

claimant "basically has tried almost all of the medications that we know for migraines," and

throughout his treatment with the claimant, he tried over *thirty different medications,* many of which

were for headaches, to easy the claimant's pain and symptoms.  (R. 288-89, 302, 303, 306, 307, 625-

28, 631). Also, within only eleven months, Dr. Torabi saw the claimant *ten times*, each time

primarily she complained of continuing headaches, anxiety, and depression. These visits are in

addition to treatments at Patient First Healthcare, Stringfellow Memorial Hospital, Regional Medical

Center, and Jacksonville Medical Center during the same year.

The ALJ committed a reversible error by not *articulating* the weight he gave to Dr. Torabi's

contrary opinions about the claimant's seizures and his long-term treatment of the claimant in general. Because the ALJ failed to articulate and give reasons for according apparently no weight to Dr. Torabi, and instead gave substantial weight only to the State agency examining physicians, the court reverses the Commissioner's decision.

Once the ALJ accords sufficient weight to the claimant's treating physicians, the court may be better able to understand why the ALJ discredited the claimant's subjective pain testimony. For instance, the ALJ stated a list of factors he considered in evaluating the claimant's subjective testimony about her pain and symptoms including, among other things, the claimant's daily activities, the duration and frequency of her symptoms, and her medications and treatments. (R.18). In his assessment, however, the ALJ did not mention the medical opinions *or even the names* of the claimant's treating physicians, such as Dr. Rothrock, Dr. Gehi, Dr. Keel, or Dr. Yates. All of these physicians treated the claimant multiple times, and, although their opinions are not necessarily contrary to the ALJ's decision, the ALJ should have afforded them weight in determining the claimant's credibility. Instead, the ALJ simply recited a brief history of a portion of the claimant's medical record and concluded that the "record does not support a finding of disability." (R. 18-20). Because the ALJ vaguely stated that he considered all of the opinions of the claimant's treating physicians but failed to articulate why he gave no weight to the treating physicians whose medical opinions relate specifically to his list of factors, the ALJ's opinion did not  meet the standard of specifically articulating the weight given to treating physicians. Based on the ALJ's decision, the court is unclear as to the grounds upon which the ALJ discredited the claimant's subjective testimony that comports with much of the medical records of the treating physicians.

## V. Conclusion

For the above reasons, the court finds that the ALJ failed to articulate the weight given to the claimant's treating physicians and, therefore, committed reversible error. Accordingly, substantial evidence does not support his decision.   Therefore, the court will reverse the Commissioner's decision and will remand it for the ALJ to determine whether the claimant is entitled to Disability Insurance Benefits or Supplemental Security Income Payments.

The court will enter a separate Order in conformity with this Memorandum Opinion.

DONE and ORDERED this 25th day of April, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE